UNITED STATES of America, Plaintiff,

v.

CITY OF CHICAGO, a Municipal Corporation, et al., Defendants,

Louis Arado, et al., Intervenor-Defendants,

Roy Isakson, et al., Intervenor-Defendants.

Renault ROBINSON and Afro-American Patrolmen's League, an Illinois not-for-profit Corporation, Plaintiffs,

v.

James B. CONLISK, Jr., et al., Defendants,

Carolyn Burauer, Intervenor-Plaintiffs.

Tadeo Robert CAMACHO, et al., Plaintiffs,

v.

CITY OF CHICAGO et al., Defendants.

Renault ROBINSON et al., Plaintiffs,

v.

William E. SIMON, et al., Defendants,

City of Chicago, Intervenor-Defendant.

Nos. 73 C 2080, 70 C 2220, 73 C 1252 and 75 C 79.

United States District Court, N. D. Illinois, E. D.

Sept. 7, 1976.

Thomas A. Gottschalk, Frank Cicero, Jr., John P. Wilson, Jr., Kirkland & Ellis, Chicago, Ill., for Renault Robinson and others.

David Rose, Donald Pailen, Deborah Seymour, Dept. of Justice, Washington, D.C., Ilana Diamond Rovner, Asst. U. S. Atty., Chicago, Ill., for the Government.

William R. Quinlan, Corp. Counsel, Earl L. Neal, Sp. Counsel, Daniel R. Pascale, Jerome A. Siegan, Roseann Oliver, Asst. Corp. Counsels, Chicago, Ill., for City of Chicago and others.

Michael L. Meyer, Barry S. Alberts, Schiff, Hardin & Waite, Chicago, Ill., for Camacho and others.

Philip B. Kurland, Norman J. Barry, Alan L. Unikel, Rothschild, Barry & Myers, Chicago, Ill., for Arado intervenors.

Richard Gutman, Chicago, Ill., for Burauer intervenors.

## MEMORANDUM DECISION

MARSHALL, District Judge.

On August 18 defendants City of Chicago, et al., submitted for approval a roster of 1091 candidates for appointment to the Chicago Police Department. These candidates consist of 550 well qualified and 541 qualified persons who have been chosen pursuant to the City's new methods of selecting police officers. The submission is here pursuant to paragraph II–D of the order of April 17, 1975 regarding selection procedures and the memorandum of June 29, 1976.

On September 1 plaintiffs, United States of America, Robinson, et al., and Burauer, et al., together with intervening defendants Isakson, et al., presented their objections to the roster and the selection procedures underlying it, pursuant to paragraph II–E of the April 17, 1975 order. Our responsibility is to rule on the objections by this date.

Time does not permit and little would now be served by a recounting of the tortured history of the City's new methods of selection. *See* 385 F.Supp. 543, 561 (N.D. Ill.); 395 F.Supp. 329, 345 (N.D.Ill.); 411 F.Supp. 218 (N.D.Ill.); 1976, 416 F.Supp. 788 (N.D.Ill.); Memorandum Order of June 29, 1976, pp. 5–7. But we should note that the methods have been altered since April 17, 1975 when the City was permitted, over strenuous objections by all other parties, to proceed with them.

Written tests which were not disclosed pursuant to the April 17, 1975 order, have been administered at the oral interview stage. These tests were disclosed only when plaintiffs, in preparation for their pending objections, took the depositions of the City's consultants, Professors Guion and Alvares. We are told that the tests have been administered experimentally and have not been used in selection decisions. They may, however, be used in the future.

Similarly, a paper by Professors Guion and Alvares entitled "Development and Validation of Procedures for the Prediction and Evaluation of Performance of Chicago Police Officers" dated July 31, 1975, was not disclosed until their depositions were taken on August 18 of this year, despite the admonition to the defendants and their "consultants" that the purpose of the April 17, 1975 order was "to assure an orderly, and timely and full disclosure of all the methods and procedures used by the defendants in their contemplated selection of police officers." Order 4/17/75, pp. 5–6.[1]

A proposal by Professors Guion and Alvares of June 11, 1975 (referred to in the

1. We note that in the July 31, 1975 report (p. 7), Professors Guion and Alvares predicted the first class of recruits in the Academy by November 15, 1975. No explanation has been offered by the City for the delay.

July 31, 1975 paper) cannot be found. Counsel for defendants state that they have never seen it. Defendant Pounian, the City's Personnel Director, cannot find it and he has advised us that Professors Guion and Alvares do not have a copy of it. All of this we find quite amazing in light of the circumstances existing in this case on June 11, 1975, the date the proposal was submitted. Surely it was of sufficient significance for the professors to retain a copy of it.

Next we were told that no written analysis of the job of patrol officer has been developed although research in the area has been conducted by City personnel under the direction of Professor Alvares. We have reviewed the activities questionnaire used in this research and it is comprehensive. But in the past we have been led to believe by the experts in this litigation that a thorough job analysis based on thorough research was *sine qua non* to a valid pre-employment test. Perhaps it isn't?

It is clear from the City's submission that Professors Guion and Alvares, who are the architects of the new methods, are not yet prepared to attest to their validity. The methods are new—not only to Chicago but everywhere—and the determination of their validity as selection devices must await future assessment of the recruits. Thus, in their paper of July 31, 1975 Professors Guion and Alvares propose "a final assessment center to be used as a basis for decision whether to convert an Academy recruit into a uniformed patrol officer." P. 8.

Finally, Professor Guion has testified on deposition that he does not regard the initial written test as having been sufficiently validated. He explained that he used the written examinations as a minimal screen from which to select a pool of patrol officers for use in predictive validity studies of other experimental tests given to these applicants, the results of which have not been used in making up the eligibility roster. These experimental tests apparently cover many traits considered desirable in a good police officer and from them it is hoped that a permanent battery of valid tests may be developed for future use in selecting police officers. Several phases of the predictive validity studies are set forth in a July 31, 1975 paper. Those studies will not be completed until 1979 at the earliest. Thus, no permanent tests or selection devices can be decided upon until that time if the City proceeds, as it apparently has elected to do, with the test development program recommended by Professor Guion. We have not forgotten, however, the fate of similar efforts by Dr. Furcon and his colleagues from the University of Chicago.

■ In these circumstances we cannot approve the methods of selection because the methods and their results are presently unknown. But as we perceive our responsibility and the scope of our inquiry in the current posture of the case, we need not consider the methods unless they produce discriminatory results. The threshold inquiry is whether "The tests in question select applicants for hire . . . in a racial [or sexual] pattern significantly different from that of the pool of applicants." *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 425, 95 S.Ct. 2362, 2375, 45 L.Ed.2d 280 (1975). If they do, further inquiry must be made into the validity of the methods of selection. If they do not, that ends the matter for we do not sit as a super Civil Service Commission.

The new methods of selection involve four steps:

1. A written examination, consisting of a reading comprehension test based upon the materials used during the first two weeks of Academy training, and a hidden patterns/figures/words test said to measure "the ability to perceive relevant stimuli within a context of extraneous perceptual material";

2. A medical examination which has been conducted in accord with earlier agreed orders entered in these cases;

3. An oral interview in which the applicant is called upon to describe his or her response to various police situations;

4. A background investigation.

In our earlier decisions in these cases while we analyzed separately the adverse impacts of the written 1971 patrolman examination, the medical examination and the background investigation and granted separate injunctive relief as to each, it was the cumulative effect of the three which compelled the total relief which was granted.

■ The objecting plaintiffs now complain of the impact of certain of the selection methods. Black and Spanish surname males did not fare as well as white males on the written test or the current background investigation. Conversely, white males did not fare as well as black males on the oral interviews, nor did women. But cumulatively the results in respect to the roster of 1091 which has been submitted by the City are as follows:

| Race/Sex Identification | % of Applicant Pool of 15,418 | % of Roster of 1,091 |
| --- | --- | --- |
| White Males | 45.4 | 50.2 |
| Black and Spanish Surname | 28.6 | 25.8 |
| Females | 25.9 | 23.9 |

In addition there remain 1234 persons found qualified through the third step—oral interviews—who have not yet undergone background investigations. They are comprised of 50% white males, 26.3% black and Spanish surname males, 1% other males, and 22.7% females.

These results do not show that persons are being selected for hire "in a racial [or sexual] pattern significantly different from that of the pool of applicants." *Albemarle, supra.* Nor do they show that the City is using "qualifications, tests, standards or procedures . . . which are not validated as job-related *and* which exclude blacks, Spanish-surnamed persons or women . . . in ratios disproportionate with the exclusion of white males of non-Spanish origin." Final decree, Feb. 2, 1976, Part I, ¶ 1(c), emphasis added. Thus the validity of the new methods is not before us as far as the tendered roster is concerned.

The United States and the Robinson plaintiffs express concern in their objections concerning the tentative or experimental nature of the selection methods and the need, according to Professor Guion, for future assessment of the new recruits. But the reporting requirements of Paragraph 11 of the final decree will provide an adequate opportunity for plaintiffs to complain of any adverse racial-sexual impact which emerges in the future. All we do here is approve the tendered roster of 1091 candidates. The totality of the new methods of selection and their results are not before us because they are not completed.

■ The intervening Isakson defendants again urge us to require the City to utilize the remainder of the 1971 patrolman eligibility and 1972 matron eligibility lists before appointing white males and females from the new roster. We have previously declined to impose that requirement on the City and we do so again.

■ The United States and the Robinson plaintiffs make special note of the standards for the background investigation, urging that they have a disproportionate impact on black and Spanish surname males. In particular, complaint is made of standards 13–17 which are convictions of disorderly conduct, criminal conduct which has not resulted in a conviction but which is proved upon hearing by a preponderance of the evidence, failure to pay judgments and excessive indebtedness, discharge from prior employment for insubordination, absenteeism or tardiness and dishonorable discharge from the military service.

We have previously expressed some concern about certain of the disqualifying standards, *e. g.*, convictions of minor offenses such as disorderly conduct or trespass.[2] But our analysis of the list of those who have been disqualified on the new background investigation reflects that they have been based upon major criminal convictions or proof of criminal conduct. In light of the reported nature of the standards which

**2.** We note the Chicago Police Officer Behavior checklist used by Professors Guion and Alvares

in their job analysis research characterizes trespass as a minor offense.

have in fact disqualified candidates it is not sufficient for the plaintiffs to show that of those disqualified, 41% were black and Spanish surnamed males as compared to 53% white males.

We conclude, therefore, that the objections to the tendered roster should be overruled and that the City should be permitted to proceed to appoint patrol officers from the roster. All that remains is when and in what ratios.

■ The final decree prescribed hiring ratios of 42% black and Spanish surname males, 42% white males and 16% females. We were reluctant to impose those ratios for, as we said in November, 1974, "It is far better in cases of this nature that the remedy come from the parties rather than the court." 385 F.Supp. at 561. It now appears that, after 2½ years of litigation and unexplained delay, see note 1, *supra*, the City is finally producing a remedy. In light of the percentages set forth above, it is not inappropriate to recall that during the two years prior to this litigation the City, from an applicant mix of 66% white males, 29 + % black males and 4 + % Spanish surname males, hired 88.5% white males, 10% black males and 1.5% Spanish surname males.

The United States urges us to modify the final decree by increasing the female ratio to 25% as representative of the approximate percentage of females who applied to become patrol officers. The 23.9% on the roster will not suffice. As a concomitant to this increase, we are urged to decrease white males to 33%, leaving black and Spanish surname males at 42%. We reject the Government's suggestion.

We have concluded in light of the results submitted by the City that hiring should go forward in the ratios that have resulted from the selection process.

The City faces a new era in its police department. Female officers will now join the ranks of what has heretofore been an all male enclave. Thirty-three to forty percent of the women who have been found qualified through the first three steps in the selection process are black. The City has undertaken, albeit grudgingly, through its consultants, to devise methods of testing and training designed to accommodate this heretofore untapped interest in police work. In all of the circumstances, we believe that it would be contrary to the public interest to superimpose upon these new methods the ratios we prescribed in the final decree at a time when the new methods still appeared to be nothing more than talk. Accordingly, for the purpose of the City appointing police officers from the roster of 1091 candidates which has been tendered to the court, the hiring ratios prescribed in paragraph 8(b) of the decree of February 2, 1976 are suspended.

The final consideration is when should appointments be made. Of recent date we have been advised by counsel for the City that the next class of 200 recruits can be enrolled in the Academy within 30 days of the approval of the roster. The call for that class should be issued immediately with a submission to the court and the parties no later than September 27, 1976 of the list of those called identified by name, current address, race and sex.

It appearing that there is no need for an evidentiary hearing in respect to the instant roster, the trial date of September 14 is vacated and the cause is set for report on status September 27, 1976 at 9:30 a. m.