The **SHIELD CLUB** et al., Plaintiffs,

v.

**CITY OF CLEVELAND** et al., **Defendants.**

Civ. A. No. C 72–1088.

United States District Court, N. D. Ohio, E. D.

Dec. 21, 1972.

Edward R. Stege, Jr., Isabelle Katz Pinzler, Legal Aid Society Public Defender, James L. Hardiman, Hardiman, Becker, Feld & Riffe, Russell T. Adrine, Cleveland, Ohio; Jeffry A. Mintz, New York City, for plaintiffs.

Malcolm C. Douglas, Nicholas M. DeVito, Wayne C. Dabb, Jr., Law Department, City of Cleveland, for defendants. Philip C. Barragate, Cleveland, Ohio, for Richard J. Faragher.

## MEMORANDUM AND ORDER

WILLIAM K. THOMAS, District Judge.

With its 1970 eligibility list for patrolman expiring, the Cleveland Civil Service Commission conducted entrance examinations for patrolman, male and female, on July 15, 1972. From the list that has been compiled there is an urgent need to provide eligible candidates to fill new positions of patrolman in the Cleveland Police Department. One hundred and eighty-eight patrolmen will be hired from funds, 75% of which will be supplied by federal grants under the Impact Cities Program of the Law Enforcement Assistance Administration (LEAA). It is not clear in the record whether the six months' duration of these grants will be extended. LEAA's original 3-year congressional funding program has 18 months remaining.

The Cleveland Impact Cities Program has the laudable goal of reducing "street crime and burglary in Cleveland, Ohio." To accomplish this the tactic is to attack these types of crime by creating a task force and special squads composed of experienced officers from basic patrol.

The 188 new police officers will be essential replacements in basic patrol. Among other objectives the program is designed to provide:

A high visibility patrol concentrating on impact crimes; affording additional protection, instant response and a comforting high visibility factor to those residents of the high crime areas.

Respect for law, however, is achieved not just by a night stick or with counterforce. It is just as important that the constitutional rights to equal protection of the laws be recognized and guaranteed in the selection and hiring of new policemen and in all the personnel practices of the Cleveland Police Department.

A complaint was filed on October 12, 1972, by The Shield Club, an organization composed principally of black police officers, and by individual plaintiffs who are black police officers, individuals who took the 1972 examination, and other interested persons. The defendants are the City of Cleveland, its Chief of Police, the Director of the Impact Cities Program, and members of the Cleveland Civil Service Commission. The complaint "challenges a broad range of practices used by the officials in the recruitment, testing, screening and hiring of new patrolmen, and in the assignment, treatment and promotion of current police officers." It also claims that the examination administered by the Civil Service Commission on July 15, 1972, has had a racially discriminatory effect on blacks and Hispanics. Separated by the court from other issues in the case, this issue has been tried in hearings that began December 8, 1972.

Oral arguments were heard December 19th. Late that afternoon this court determined that it had jurisdiction to hear and determine this case; it certified the class qualified to bring this action. The court concluded that the evidence created a prima facie case that the battery of tests constituting the examination of July 15, 1972, had a racially discriminatory impact upon the blacks and Hispanics who took the examination. Of all persons who took the examination, 23% were black and Hispanic. Of the total number of persons who failed the examination, 64% were black and Hispanic. Of the total number of blacks and Hispanics who took the test, 26.3% failed; but of the whites who took the test, only 4.5% failed.

Under prevailing case law this prima facie showing of racial impact shifted the burden to the defendants to show a manifest relationship between the tests given and the position of patrolman. The source from which that burden was derived is Griggs v. Duke Power Co., 401 U.S. 424, 431, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971).

If an employment practice which operates to exclude Negroes cannot be shown to be related to job performance, the practice is prohibited.
* * * *

. . . Congress directed the thrust of the Act to the *consequences* of employment practices, not simply the motivation. More than that, Congress has placed on the employer the burden of showing that any given requirement must have a manifest relationship to the employment in question. *Id.* at 432, 91 S.Ct. at 853.

It is not shown that the racially discriminatory impact of the tests is intentional. On the contrary, the Civil Service Commission President testified:

My entire goal was to get the kind of test that would not keep out minority people.

However, lack of discriminatory intent does not offset the discriminatory impact.

[G]ood intent or absence of discriminatory intent does not redeem employment procedures or testing mechanisms that operate as "built-in headwinds" for minority groups and are unrelated to measuring job capability. *Griggs*, supra 432, 91 S.Ct. 854.

Courts have been quick to apply *Griggs* to public employment cases involving policemen, firemen, and teach-

ers. Thus, Castro v. Beecher, 459 F.2d 725, 732 (1 Cir. 1972) declares:

> The public employer must, we think, in order to justify the use of a means of selection shown to have a racially disproportionate impact, demonstrate that the means is in fact substantially related to job performance. It may not, to state the matter another way, rely on any reasonable version of the facts, but must come forward with convincing facts establishing a fit between the qualification and the job. In so concluding, we rely in part on the Supreme Court's opinion in Griggs v. Duke Power Co., *supra*.

█ The court concluded and now reaffirms that because it has not yet been demonstrated that the tests included in the examination are job related the defendants have failed to overcome the prima facie showing that the tests have a racially discriminatory impact. Griggs v. Duke Power Co., *supra*; Castro v. Beecher, *supra*; Commonwealth v. O'Neill, 345 F.Supp. 305 (D.C.Pa.1972); Chance v. Board of Examiners, 458 F.2d 1167 (2 Cir. 1972).

Having reached those conclusions the court decided that the plaintiffs were entitled to injunctive or mandatory relief in some form. The final form of relief was reserved until after a further hearing, including the taking of additional testimony from Dr. Byron Svetlik, Director of Psychological Research Services, Case Western Reserve University. That hearing has now been held and the court now completes its ruling begun last Tuesday. In a constitutional sense the plaintiffs have established that the class they represent will be irreparably harmed if some relief is not granted. Yet the court has endeavored to balance the equities, taking into account the interests of all, including the public interest in fixing the relief that the record warrants.

The court has considered and studied all alternative forms of relief that offer a workable and responsive remedy. Only tough choices, each freighted with some weakness and the risk of individual or group inequities face the court. These agonizing deliberations have proceeded under the same pressures of time that have confronted the parties and counsel throughout the preparation, trial, and argument of this cause.

However, once it was decided that the defendants were not entitled to a dismissal and judgment, the most clear-cut form of available relief would be to grant a total injunction against any use of the eligibility list until a court-ordered job validation study of the test battery is undertaken and completed. But it is evident that if not used immediately the federal grants may be withdrawn. In the meantime Cleveland, and all of its citizens, would have grievously suffered from crimes of violence that may reasonably be expected to be prevented by putting the Impact Cities Program into effect. Thus, the court, after balancing the equities, has concluded that it is necessary to grant affirmative relief.

The court has considered an order that would enjoin permanent appointments from the eligibility list. The court has also considered the addition of points to the score of each black and Hispanic testee to compensate for the lower mean scores registered in the verbal, numeric, and pictorial reasoning tests. For different reasons unessential to this decision, each of these alternative forms of remedy has been found presently not feasible and unsatisfactory.

█ Plaintiffs have proposed that this court should order the appointment, from the eligibility list, of specified percentages of black and Hispanic persons in relation to their total representation in either the population of the City of Cleveland (38%) or in relation to the number of blacks or Hispanics who took the test (23%). Defendant opposes the use of any percentage figure on the ground that it would constitute a quota. For the reasons that follow this court has determined that in this case a percentage formula provides the only suitable relief.

Any injunctive relief that is granted is devised primarily to obtain the appointment of qualified black and Hispanic testees who but for the possible discriminatory impact of the examination on their test scores would have merited appointment. It is concluded that this will be best accomplished by insuring that a minimum percentage of those black and Hispanic testees who passed the examination are appointed.

It is concluded that, with allowance of plus or minus one percent, the minimum number of appointments should be fixed at a percentage (fraction), the numerator of which is the total number of blacks and Hispanics who passed the examination and the denominator of which is the total number of all persons who passed the examination. The result is 18%.

It is this court's understanding that women will be included among the 188 new patrolmen who will be hired. The 18% formula is intended to apply to black and Hispanic appointments both male and female.

Remedies comparable to the approach adopted by this court have been approved in the following cases: Castro v. Beecher, *supra*; Carter v. Gallagher, 452 F.2d 315 (8 Cir. 1971); Commonwealth of Pennsylvania v. O'Neill, 348 F.Supp. 1084 (D.C.1972), rev'd per curiam (as to relief) slip opinion Case No. 72–1614 (3 Cir., September 14, 1972), vacated 473 F.2d 1029 (3 Cir. 1972), and the decision of Judge Krupansky in Sims v. Sheet Metal Workers Int'l. Association, Local Union No. 65, 353 F.Supp. 22 (N.D.Ohio, 1972).

Any claim of historic discrimination in the selection of black and Hispanics as Cleveland policemen has not been litigated in this first segment of the case. For this reason the court has refrained from making any ruling thereon. However, there is historic evidence in the record that underpins and justifies the mandatory relief previously specified.

Statistics compiled by the United States Commission on Civil Rights (Cleveland hearings) reveal that in 1966 there were 2,186 policemen and policewomen in the Cleveland Police Department. Of that number 135 or 6.2% were black; there was one Puerto Rican. As of November 21, 1972, the Cleveland Police Department employed 2,299 policemen and policewomen. Of that number, 186 or 8.1% are black; there is still only one Puerto Rican. This modest increase of two percent in six years is much less than the substantial increase in Cleveland's black and Hispanic population. The 1970 census reveals that the total population of Cleveland is 750,903; composed of 458,084 whites and 287,841 blacks, 38.-3% of Cleveland's total population. The historic percentage of minority membership in the Cleveland Police Department continues to be under 10% even though both the black and Hispanic populations continue to grow.

The Police Department has a community relations unit. Its commanding officer described the unit's program to improve police relations in the whole community. The evidence, however, does not reveal that this community relations program has yet approached the desirable goals that were outlined before the United States Civil Rights Commission in its Cleveland hearings in April 1966. A former New York City police inspector who studied the Cleveland Police Department thus testified:

I believe that the department should take or set up a positive program of community relations, rather than acting as they do now, completely on the defensive. I believe that the department, themselves, should institute community relations training programs, that they should try to improve the image of the Police Department, not only with the Negro community, but with the whole community-at-large. You cannot improve recruiting unless you can convince the citizens of your city that the police job is something that is worthwhile. That the police career is something that is to be desired. Hearings before the

United States Commission on Civil Rights; Cleveland, Ohio 680–81 (April 1–7, 1966).

A substantial increase in the number of black and Hispanic police officers in the Department should assist the Cleveland Police Department in administering its overwhelmingly difficult and daily frustrating job of enforcing the law in Cleveland. This is particularly true in the "high crime area" to which the Impact Cities Program is directed. Breaking this historic precedent of "under ten percent" minority membership in the Department is, therefore, essential and imperative. The relief here ordered will accomplish this break with the past that is still present.

In appointing the 188 new policemen authorized by the Impact Cities grant the Safety Director, as the appointing authority, may comply with the Civil Service provisions of the Cleveland City Charter and the Civil Service Commission's regulations in all respects, except as this order otherwise directs.

The blacks and Hispanics who passed the test shall be appointed from names certified by the Civil Service Commission and properly screened, in the order in which they appear on the list, and in sufficient numbers that at least 18% (plus or minus one percent) of the 188 policemen appointed, shall be black or Hispanics.[1]

■ It appears to the court that the Safety Director may be able to comply with the order of this court by use of his discretionary powers in making appointments. Under the Charter of the City of Cleveland, Section 131 provides,

The appointing authority shall appoint to such position one of the three persons whose names are so certified.

However, to the extent that the exercise of this discretionary power fails to achieve the formula of 18% (plus or minus one percent), he is nevertheless required to comply with the order of this court. The requirements and limitations of the City Charter and the Civil Service Regulations must yield to the Fourteenth Amendment and the Equal Protection of the Laws clause.

Once the 188 new police are appointed by the Safety Director, using the 1972 eligibility list as herein directed, the defendant Civil Service Commission and the Safety Director are enjoined from making any further use of the eligibility list until an appropriate job validation study has been conducted and it be found therefrom that the tests making up the Civil Service examination of July 15, 1972, are job related.

Should the Civil Service Commission proceed with the validation study of the 1972 battery of tests, this court retains jurisdiction to determine whether in light of that study the 1972 eligibility list may again be used.

In the alternative the Commission may determine that it should cancel the 1972 eligibility list once the 188 policemen are hired from the list. The Civil Service Commission would then proceed to establish a new eligibility list, necessarily employing tests or selection procedures that conform to the Fourteenth Amendment and other applicable law.

It is so ordered.

1. This order is consistent with the opinions of Dr. Svetlik who selected the battery of tests used in the Civil Service examination of July 15, 1972. In his further testimony of December 21, 1972, in response to the court's question as to how the eligibility list might be now used, Dr. Svetlik, in part, testified:
"What you could possibly do is to separate the two lists of names and then select some sort of percentage from each group.

"If my opinion is correct, and that these tests will in fact show substantial validity with performance at some later point, you would at least have the safety of selecting the top members from each group, albeit that the blacks score some points lower than the whites. And looking at the demands of the police patrolmen, I think that selecting from the top of each of these lists would give you men who would all be successful patrolmen . . . ."