KEITH, Circuit Judge,
dissenting.
I must dissent. This case arises out of a struggle spanning three decades to remedy a judicial finding of racial discrimination in the hiring practices of the Cleveland Fire Department. While the majority places much weight on the lifespan of the remedy, it gives short shrift to the fact that the invidious past discrimination by the Cleveland Fire Department responsible for the racial disparities among firefighters has itself operated with impunity for countless years. After three federal district judges had established the unconstitutionality of the City of Cleveland’s hiring practices, all parties agreed to a remedy and memorialized their agreement in the form of a consent decree, signed into effect by the district court. It is precisely the parties’ consent, not the personal preference of the judge, that animates the legal force of a consent decree. See Local No. 93, Int’l Ass’n of Firefighters v. City of Cleveland, 478 U.S. 501, 525, 106 S.Ct. 3063, 92 L.Ed.2d 405 (1986). In this case, when all parties agreed to an extension of time under the express provisions of the consent decree, I find that the district court abused its discretion in denying the parties’ joint motion.
A consent decree is “essentially a settlement agreement subject to continued judicial policing.” Williams v. Vukovich, 720 F.2d 909, 920 (6th Cir.1983). Consent decrees are indeed “a strange hybrid in the law.” Brown v. Neeb, 644 F.2d 551, 557 (6th Cir.1981). They are at once “a voluntary settlement agreement which could be fully effective without judicial intervention” and “a final judicial order ... placing the power and prestige of the court behind the compromise struck by the parties.” Williams, 720 F.2d at 920. Consent decrees “should be strictly construed to preserve the bargained for position of the parties.” Id. Courts have an affirmative duty to protect the integrity of its decree and ensure that the terms are effectuated. See Stotts v. Memphis Fire Dep’t, 679 F.2d 541, 557 (6th Cir.1982), rev’d on other grounds sub nom., Firefighters Local Union No. 1784 v. Stotts, 467 U.S. 561, 104 S.Ct. 2576, 81 L.Ed.2d 483 (1984).
The underlying facts in this case bespeak both a long, storied history of racial discrimination against Blacks and Hispanics in the City of Cleveland and a persistent manifestation of the parties’ intention to work collaboratively to remedy that discrimination as a means of saving time, expense, and the risk of further litigation. The parties’ sustained negotiations yielded the Second Amended Consent Decree, which the district court, having signed the decree into effect, had an obligation to strictly construe to preserve the bargained-for position of the parties.
The court below was tasked with construing the terms of the Second Amended *744 Consent Decree to determine whether the extension of time requested by both the plaintiffs and defendants was warranted. Instead, the district court terminated the Second Amended Consent Decree after finding that a 26% minority firefighter population, a shortcoming of the express goal of 33 1/3%, evidenced “substantial compliance” under the consent decree such that judicial monitoring was no longer necessary.
The district court’s termination decision was based substantially, if not exclusively, on its conclusion that it was called for, perhaps even mandated, by the Supreme Court’s decision in Ricci v. DeStefano, 557 U.S. 557, 129 S.Ct. 2658, 174 L.Ed.2d 490 (2009). This Court should disagree because this interpretation and application of Ricci is based on the unwarranted assumption that there exists a hypothetical person or class of persons in the Northern District of Ohio who could establish by relevant and admissible evidence the factual basis that would be necessary for that person or class of persons to become entitled to the relief obtained by the Ricci plaintiffs.
In its termination decision the district court did not identify any such person or class of persons as a party to the case which is now before the Court.
If such a person or class of persons does indeed exist, that person or class of persons is, of course, free to file a complaint seeking that relief. This Court, however, should not become an advocate for, or adjudicate, a hypothetical cause of action that might be filed by such a hypothetical person or class of persons. Nor should this Court affirm the unwarranted assumption of the district court that such a person or class of persons in fact does exist which would be necessary before this Court could affirm the district court’s termination decision.
I depart from the majority because I believe that the factual record is sufficiently developed for this Court to address the issue actually presented: whether the district court abused its discretion in denying the City of Cleveland’s motion to extend the Second Amended Consent Decree. Because I find that the district court did abuse its discretion, I would reverse the district court and remand with instructions to enter the extension of five and a half years that was proposed and agreed upon by all parties. I further decline to vacate and remand to the district court for the purpose of embarking on a strict scrutiny excavation when: the constitutionality of the consent decree has already been litigated and resolved in the form of a Second Amended Consent Decree, neither the parties nor the district court challenged the constitutionality of the consent decree, and there has been no intervening change in facts or law that would require the court below to revisit the constitutionality of the consent decree.
I.
A.
In 1973, Lamont C. Headen, along with several other aspiring African-American firefighters who passed the requisite Civil Service Examination, filed a class action suit against the City of Cleveland (“City”) on behalf of African-American and Hispanic applicants who were not offered employment as firefighters in the Cleveland Fire Department. The plaintiffs alleged that Cleveland’s hiring practices amounted to discrimination on the basis of race, col- or, and national origin in violation of the Thirteenth and Fourteenth Amendments to the U.S. Constitution; 42 U.S.C. §§ 1981, 1983; and O.R.C. § 4112.02. The plaintiffs requested equitable relief as well as monetary damages. The Complaint averred that although 40% of the Cleve *745 land population was Black, only 4% of the Cleveland firefighters were Black. The plaintiffs further alleged that the defendants did not engage in any substantial efforts to recruit Black or Hispanic firefighters. The plaintiffs attributed the discrimination to a schema of standard hiring practices that functioned as exclusionary devices to Black and Hispanic applicants. More precisely, the plaintiffs averred that:
(a) Written tests used as a prerequisite for employment exclude a disproportionately high number of minority applicants for employment as compared to the White applicants and have not been professionally developed nor validated to establish any predictive or reasonably predictive validity evidence that the tests measure job performance;
(b) The background investigation and oral interviews exclude a disproportionately high number of minority ap-
. plicants for employment as compared with White applicants because:
(i) factors are used to deny employment to minority persons which are not related to job performance;
(ii) arbitrary discretion is vested in the Defendants to decide whether or not to employ an applicant; this arbitrary discretion has been used by the Defendants to deny employment to a high proportion of minority applicants as compared with White applicants.
(c) The psychological examinations are conducted by means of a written examination which discriminates against minority applicants and which fails to take into account the differing cultural experiences of minority applicants as compared to White, largely middle-class applicants. Individuals are eliminated for “psychological” reasons which are not job related.
(d) The medical examination excludes a disproportionately high number of minority applicants for reasons not related to the medical and physical requirements of the job of fireman.
On April 25, 1975, after an evidentiary hearing on these issues, the district court made a finding that the City had unlawfully discriminated against African-Americans and Hispanics in the hiring of firefighters — namely through the administration of an examination that was previously discredited as violative of the Fourteenth Amendment.[1] The presiding district court judge, Judge Robert B. Krupansky, found:
IT APPEARING to the Court that the. entrance examination heretofore administered by the Defendants to candidates for the position of firefighter with the City of Cleveland Fire Department was an examination identical to the examination heretofore administered to candidates for the position of patrolman and patrolwoman; and it further appearing that this identical patrolman’s examination was judicially determined to be in violation of the [Ejqual [Protection [Cjlause of the Fourteenth Amendment to the United States Constitution by the Honorable William K. Thomas in the case of Shield Club v. City of Cleveland, et al., Civil Action No. C72-1088, United States District Court for the Northern District of Ohio, Eastern Division;
IT FURTHER APPEARING that the within action was filed on April 3, 1973 and that the Defendant Civil Service *746 Commission has failed since April 6, 1973 to exercise diligent efforts to develop a new job-related entrance examination for the position of firefighter; and IT FURTHER APPEARING that the remaining issues concerning the selection of firefighters for the City of Cleveland Fire Department are intimately interwoven as a practical matter with the administration of the entrance examination; and that said related issues bear a similar likeness to the issues fully litigated and determined by the Honorable William K. Thomas in the aforementioned case of Shield Club v. City of Cleveland....
Judge Krupansky enjoined the City from hiring new firefighters until, inter alia, the court approved both a proposed entrance examination that was demonstrably job-related and revised screening procedures that were objective, job-related, and nondiseriminatory. As a result of Judge Krupansky’s findings and Order issued on April 25, 1975, the City submitted a proposed plan which reformed the City’s hiring practices for firefighters on January 14, 1977. The plan primarily consisted of proposals to boost recruitment of minority applicants, restructure the entrance examination to be job-related, and revise the screening procedures to be more transparent and objective. Important to this appeal, the plan also proposed a formula devised to remedy past discrimination which provided that the ratio of minorities to non-minorities hired may not be less than the ratio of minorities to non-minorities who passed any given entrance examination (hereinafter the “Headen ratios”). Remarkably, all parties entered into a consent decree agreeing that the City’s proposed plan “fully complies” with the terms of the district court’s order. On January 17, 1977, this consent decree was ordered into effect by then-recently-assigned Judge John M. Manos.
The consent decree was amended on May 21, 1984, after the Vanguards of Cleveland (“Vanguards”),[2] an organization of Black and Hispanic firefighters employed by the City, were made parties to the Headen litigation. The amended consent decree, approved and adopted by Judge Manos, redefined the remedial provisions of the 1977 consent decree. Throughout the life of the consent decree, the minority firefighter population steadily increased, reaching a zenith of 26% by 2000.
B.
The issues in the instant appeal stem from the following events in 2000 when the *747 consent decree was amended for a second time.
On January 26, 2000, the City filed a Motion to Stay Further Execution of the Amended Consent Decree. Shortly thereafter, on February 1, 2000, the Cleveland Firefighters for Fair Hiring Practices (“CFFHP”) filed a lawsuit against the City of Cleveland which was consolidated with the Headen litigation. The CFFHP alleged that the 1977 and 1984 consent decrees unconstitutionally discriminated against White applicants to the fire department. The Vanguards defended the consent decree’s constitutionality, while in turn claiming that the City had continued to engage in discriminatory hiring practices against minorities. The City all the while denied engaging in any such discriminatory practices. The district court held a hearing on February 2, 2000 to contend with the antithetical positions held by all the parties. After the hearing, the court denied the City’s motion and encouraged the parties to engage in informal discovery and good faith negotiations. These negotiations produced a Second Amended Consent Decree, which was signed into effect by the district court on September 29, 2000.
The Second Amended Consent Decree (“2000 Consent Decree”), signed by all parties, begins with the acknowledgment that the district court found “that the City of Cleveland had unlawfully discriminated against minorities in the hiring of firefighters.” The 2000 Consent Decree expressed the following findings: 38.1% of the individuals who met the qualifications to sit for the then-most-recent firefighter examination were minorities; as of 2000, only 26% of the City’s firefighters were minorities; and after informal discovery, the City and the Vanguards both “believe[d] that the Second Amended Consent Decree [was] necessary to fully remedy the effects of the City’s past discrimination in hiring of firefighters, and to prevent any further discrimination in the future.” Although CFFHP disputed whether the 2000 Consent Decree was necessary to fully remedy past discrimination, it nonetheless agreed that “consistent with the Supreme Court’s directives in a series of cases including but not limited to City of Richmond v. J.A. Croson, 488 U.S. 469, 109 S.Ct. 706, 102 L.Ed.2d 854 (1989) and Adarand Constructors, Inc. v. Pena, 515 U.S. 200, 115 S.Ct. 2097, 132 L.Ed.2d 158 (1995), as well as the Sixth Circuit’s guidance in Aiken v. City of Memphis, 37 F.3d 1155 (6th Cir.1994),” it desired to “resolve these actions and to preclude any further extension and/or modification of the consent decree except as provided [within the consent decree].” (emphasis added). The CFFHP, along with the rest of the parties, further consented to entry of the Second Amended Consent Decree, which in pertinent part provided:
1. The Headen decree shall remain in full force and effect until the City of Cleveland Department of Public Safety, Division of Fire, reaches a 33 1/3 % minority makeup or until the City has established and hired cadets from three eligible lists, (which shall include the current list originally certified in 1999 and herein referred to as the “1999 Eligible List”), whichever occurs first. Pursuant to Civil Service Rules, eligible lists are valid for two years. However, recognizing the lifespan of three lists and the possible need for some additional administrative time, the City will have three lists (including the 1999 Eligible List which expires on September 29, 2002) established and appointments made therefrom before September 29, 2008. The parties understand that there may be legitimate circumstances which may prevent the City from establishing and hiring from the two additional eligible lists anticipated herein within *748 the prescribed time. If the City is unable to establish three lists (including the 1999 Eligible List) and hire therefrom before September 29, 2008, the City may petition the Court for a reasonable extension of time within which to establish the remaining eligible lists and make appointments therefrom during the life of said lists. Such a petition by the City shall be approved for a reasonable time, provided that the City has made a good faith effort to meet the September 29, 2008 deadline. The percentage makeup of the Division of Fire shall be computed by determining the percentage of minorities (as defined by the decree) within the uniformed ranks of the Division of Fire, regardless of rank.
In the years following the 2000 Consent Decree, there were two main intervening occurrences that have impeded its full implementation. First, the City experienced a hiring freeze resulting from a confluence of factors including a budget crisis and the implementation of the statewide “DROP” program. The Ohio Police & Fire Pension Fund established the DROP program in 2003 to function as an incentive for eligible firefighters to postpone retirement. The 211 Cleveland firefighters who participated in the DROP program effected a hiring freeze when those would-be vacant positions were no longer available to potential hirees on the eligible list. The second occurrence was when Judge Manos, who had presided over the Headen litigation and this consent decree for 22 years, passed away and Judge Donald Nugent was assigned to this case in 2008.
On September 26, 2008, upon what the parties seem to agree was the natural termination of the consent decree, the City of Cleveland filed a Motion for Extension of Time to Comply with the Headen Decree, pursuant to the terms of the consent decree. The City claimed that “due to circumstances beyond [its] control it [had] not reached the 33 1/3% minority make-up nor been able to establish the second and third eligibility lists.” The City cited a variety of occurrences beyond its control that hampered the City’s compliance with the 2000 Consent Decree, including a budget crisis and the DROP program. The Vanguards subsequently filed a Motion to Extend the Terms of the Second Amended Consent Decree on September 29, 2008. On October 24, 2008, the CFFHP filed a response opposing the extension requested by the City and the Vanguards. The district court held an evidentiary hearing on May 29, 2009, ostensibly to determine whether the City met the two prerequisites for an extension: (1) a good faith effort by the City to meet the September 29, 2008 deadline and (2) legitimate circumstances preventing the City from establishing two additional eligibility lists. However, after the parties presented evidence on these issues, the district court dispensed with closing arguments and asked the parties to brief why a third amended consent decree was necessary.
After the hearing on May 29, 2009, the parties “engaged in extensive discussion seeking a compromise to avoid further contentious and expensive litigation, restore harmony among the members of the Cleveland Fire Department, obtain additional manpower/womanpower within the firehouses as soon as reasonably possible, and ensure the safety of the residents of the City of Cleveland.” During those discussions, the parties “negotiated what they unanimously agree[d] [was] a reasonable, necessary, practical, and fair response to the [petition for an extension of time] by the City.” The parties consented to a proposed a modification of the consent decree which would read as follows:
The Headen decree shall remain in full force and effect until the City of Cleveland Department of Public Safety, Divi *749 sion of Fire, reaches a 33 1/3% minority makeup or until December 31, 2014, whichever comes first. Pursuant to Civil Service Rules, eligible lists are valid for two years. Pursuant to this Stipulation and Order, the City is required to have no less than one new eligible list established and appointments to any existing Department vacancies made therefrom before December 31, 2014. For these purposes, the percentage makeup of the Division of Fire shall be computed by determining the percentage of minorities (as defined by the decree) within the uniformed ranks of the Division of Fire, regardless of rank.
Despite each party’s clear intent to support an extension of the 2000 Consent Decree for at most five and a half more years, and notwithstanding the provision in the 2000 Consent Degree that contemplated an extension of time for this very factual scenario, Judge Nugent ultimately denied the City’s and Vanguards’ motion for an extension of time, thereby terminating the 2000 Consent Decree in an order dated August 29, 2009.
In its Order, the district court expressed the following findings:
The history of this case makes clear that past injustices indeed existed in the City of Cleveland with respect to the hiring of minority firefighters. However, the [district court] has found that the City has made a good faith effort to comply with the remedy designed to right those wrongs. The evidence demonstrates that it was not the City’s lack of effort, but rather circumstances beyond its control, that resulted in it falling short of satisfying the goals in the [2000 Consent Decree]. Based upon the evidence relating to the pending Motions, the Court finds that judicial monitoring is no longer a necessity.
The court further reasoned that the City’s “good faith effort to comply” with the 2000 Consent Decree demonstrates that the City has a “foundation that will lead to increased minority representation once the economy allows for a more routine hiring process to resume.”
The Headen plaintiffs, Vanguards, and City of Cleveland[3] now appeal the district court’s denial of their respective motions for an extension of time to comply with the 2000 Consent Decree. Interestingly, notwithstanding the fact that the CFFHP agreed to the terms of the original 2000 Consent Decree and an extension of the 2000 Consent Decree, on appeal the CFFHP now argues that an extension of the 2000 Consent Decree is unconstitutional under the Supreme Court’s decision in Ricci v. DeStefano, 557 U.S. 557, 129 S.Ct. 2658, 174 L.Ed.2d 490 (2009).
II.
I dissent because I believe the district court clearly abused its discretion when it denied a motion by both plaintiffs and defendants for an extension of time given the occurrence of a factual scenario that the 2000 Consent Decree both contemplated and prescribed a remedy for — the very remedy that the parties requested. This abuse of discretion was aggravated when all parties had come to the table, negotiated, and agreed to a proposed final extension of at most five and a half years, only for the district court to dismiss their proposed modification and terminate the decree premature of reaching the agreed-upon remedial goal of either a 33 1/3% minority population or the hiring of firefighters from two additional eligibility lists. *750 Not only do I take issue with the obstructionist and incongruent action of the district court, I further disagree with the majority that the issue presented to our Court is one that necessitates a strict scrutiny analysis absent a direct challenge before the district court regarding the constitutionality of the extension. Moreover, even if such an inquiry were necessary, I find the considerations proffered by the majority to be misguided. I would reverse the district court and remand with instructions to enter the stipulated agreement of the parties which would extend the decree for five and a half years, at most.
A.
This is a unique case. This is not a case involving a voluntary race-conscious remedy initiated by a state actor and challenged on constitutional grounds by another party; nor a case where the interpretation of a consent decree’s terms is bitterly contested by the parties; nor is it a case where one party is unilaterally seeking a modification. Rather, this is a case involving a consent decree in which all parties agreed to the existence of the underlying past discrimination and the appropriateness of the prescribed remedy.
As the Supreme Court observed in United States v. Armour & Co., 402 U.S. 673, 91 S.Ct. 1752, 29 L.Ed.2d 256 (1971):
Consent decrees are entered into by parties to a case after careful negotiation has produced an agreement on their precise terms. The parties waive their right to litigate the issues involved in the case and thus save themselves the time, expense, and inevitable risk of litigation. Naturally, the agreement reached normally embodies a compromise; in exchange for the saving of cost and elimination of risk, the parties each give up something they might have won had they proceeded with the litigation. Thus, the decree itself cannot be said to have a purpose; rather the parties have purposes, generally opposed to each other, and the resultant decree embodies as much of those opposing purposes of one of the parties to it. For these reasons, the scope of a consent decree must be discerned within its four corners, and not by reference to what might satisfy the purpose of one of the parties to it.
402 U.S. at 681-82, 91 S.Ct. 1752. In the instant case, the consent decree was a product of careful negotiation that resulted from, rather than in lieu of, a judicial finding of discrimination.
A plain reading of the terms of the 2000 Consent Decree makes it difficult to reconcile the district court’s anomalous decision. The decree clearly states that the decree “shall remain in full force and effect until the City of Cleveland Department of Public Safety, Division of Fire, reaches a 33 1/3% minority makeup or until the City has established and hired cadets from three eligible lists ... whichever occurs first.” It is indisputable that the Fire Department neither reached a 33 1/3% minority makeup nor established and hired cadets from three eligible lists. Nevertheless, the consent decree prudently provides a safety-valve by acknowledging that “the parties understand that there may be legitimate circumstances which may prevent the City from establishing and hiring from the two additional eligible lists anticipated herein within the prescribed time.” The decree then continues to state that “[i]f the City is unable to establish three lists and hire therefrom before September 29, 2008, the City may petition the Court for a reasonable extension of time with which to establish the remaining eligible lists and make appointments therefrom during the life of said lists.” And, “[s]uch a petition shall be approved for a reasonable time, provided that the City has made a good faith effort to meet the September 29, 2008 deadline.” (emphasis added). The text outlines “legitimate circumstances which *751 may prevent the City from establishing and hiring two additional eligible lists within the prescribed time” and “a good faith effort to meet the September 29, 2008 deadline” as the two dispositive factors in determining whether the City’s petition “shall be approved.”
The district court expressly found the occurrence of the requisite legitimate circumstances and a good faith effort on behalf of the City to meet the September 29, 2008 deadline. Upon making these findings, the district court’s only inquiry should have been what would constitute a reasonable time by which to extend the decree. Instead, the district court completely disavowed the language of the decree and decided that judicial oversight was no longer necessary. Upon reviewing the facts in the record, I struggle to find a legitimate justification for the district court’s departure from the terms of the consent decree that it signed into effect.
The majority hesitates to strictly enforce the terms of the decree in fear that doing so would essentially render the district court’s role in administering a consent decree to be ministerial — a mere instrument of the consent decree or the parties’ stipulations to it. But this characterization undervalues the district court’s agency in facilitating, forming, and deciding to sign the consent decree into effect in the first place. It is not readily apparent how the district court’s role is reduced to an instrument of the parties’ stipulations by merely enforcing the terms of the consent decree that the district court signed into effect. Moreover, I find the inverse scenario, in which judges completely disregard the plain text of a consent decree, to be more offensive to the role of a court supervising a judicial order.
As I see it, the district court’s role supervising this consent decree was not ministerial, but deeply involved. The district court found that the City of Cleveland unlawfully discriminated against Blacks and Hispanics in the hiring of firefighters. The same district court had the original discretion to give legal force to this consent decree. The court, via Judge Manos, decided in its discretion to place the imprimatur of the court on the 2000 Consent Decree. The district court further had discretion in .determining whether the City’s noncompliance with the consent decree resulted from “legitimate circumstances.” The court, in its discretion, found that it did. Finally, the district court had the discretion to determine whether or not the City acted in good faith. Again, the court found that it did. Given those findings, the court had an affirmative duty to protect the integrity of its decree and approve the City’s motion for a reasonable extension of time unless the court’s interest in implementing the plain language of the decree was superceded by an interest in either modifying or terminating the consent decree. The record shows no superceding interest in modifying or terminating the decree.
Of course, the majority is correct that the district court has discretion to terminate the decree, but the discretion to terminate a consent decree is limited to situations where the consent decree has met its underlying goal. See Youngblood v. Dalzell, 925 F.2d 954, 960 (6th Cir.1991); Board of Educ. of Okla. City Public Schools v. Dowell, 498 U.S. 237, 111 S.Ct. 630, 112 L.Ed.2d 715 (1991) (holding that the district court must consider whether the vestiges of past discrimination had been eliminated to the extent practicable before dissolving a desegregation decree). We have held that “[a] district court must look to the specific terms of a consent decree in determining whether and when to terminate supervision or jurisdiction over it.” Gonzales v. Galvin, 151 F.3d 526, 531 (6th Cir.1998). The district court must further “determine that the goals of *752 the consent decree have been achieved.” Youngblood, 925 F.2d at 961. In Gonzales, this Court outlined the following six factors that the district court should consider in deciding whether to terminate a consent decree: (1) whether any specific terms provide for continued supervision; (2) the underlying goals of the consent decree; (3) whether there has been compliance with prior court orders; (4) defendants good faith effort to comply; (5) the length of time the consent decree has been in effect; and (6) the continuing efficacy of the consent decree’s enforcement. Gonzales, 151 F.3d at 531. Although the district court should consider these factors, we made it clear that “Notwithstanding this list of ‘factors,’ a district court may not terminate its jurisdiction until it finds both that Defendants are in compliance with the decree’s terms and that the decree’s objectives have been achieved.” Id.
In the instant case, the district court clearly did not lend much weight, if any, to the express terms of the 2000 Consent Decree relating to its obligation to approve an extension. The court similarly gave scant attention to the fact that the underlying goals of the 2000 Consent decree were not met. The City had neither achieved a 33 1/3% minority firefighter workforce nor created the two eligible lists that it was obligated to create. Nonetheless, the district court somehow found that the City of Cleveland had “substantially complied” with the goal of the consent decree because the minority makeup of the Fire Department had reached 26%. There is no indication why 26% suffices as substantial compliance, especially in light of the fact that the fire department had a 26% minority makeup in 2000 when Judge Manos and all parties found it necessary to approve the 2000 Consent Decree. Moreover, in the seven years between 2001 and 2008, when the City severely restricted its hiring, the minority population stayed stagnant. Yet in 2009, after 9 years of virtually no progress toward the agreed-upon goals of a 33 1/3% minority makeup or two additional eligible lists, Judge Nu-gent found that “the City’s efforts have resulted in substantial compliance with the stated goal of 33 1/3% minority makeup.” The district court cannot square this finding with the fact that the City was in a state of noncompliance with the 2000 Consent Decree for eight years. The district court improperly applied the law from our consent decree cases by placing too much weight on the length of the remedy while disregarding both the mandated extension and the stated goals of the consent decree. In my view, this was a clear abuse of discretion.
Interestingly, the district court draws parallels to our unpublished decision in Rutherford v. City of Cleveland, 179 Fed.Appx. 366 (6th Cir.2006), to support its termination of the 2000 Consent Decree. The court’s reliance on Rutherford is puzzling. There, we upheld the constitutionality of a consent decree between minority police officers and the City of Cleveland after non-minority police officers challenged the decree’s constitutionality. The consent decree in Rutherford had a similar background as the consent decree in the Headen litigation in that it resulted from a judicial finding of racial discrimination in the hiring practices of the City of Cleveland — primarily based on the use of a discriminatory entrance examination. The terms of the Rutherford consent decree similarly set a remedial goal of a 33% minority workforce by a defined date through the use of a hiring ratio. The terms of the consent decree in Rutherford also allowed for an extension in the event of certain occurrences. In Rutherford, however, the district court terminated the consent decree only after the Cleveland Police Department had actually met the goal of a 33% minority police force using a hiring ratio of three minorities to every *753 four non-minorities. The district court in Rutherford enforced the extension provision in the consent decree until the express goal of the decree was met. In the instant case, the district court failed to enforce the extension provision in the 2000 Consent Decree and terminated the consent decree premature of the express goals being met. Moreover, when the appellants in Rutherford argued that the 29.6% minority population “substantially met” their target of 38%, such that an extension of the consent decree was unjustified, we held that even with a 29.6% minority population, the consent decree was justifiably extended by its own terms until the express goal of a 33% minority workforce was met. See Rutherford, 179 Fed.Appx. at 380. Thus, Rutherford further suggests that the district court’s termination of the 2000 Consent Decree was an abuse of discretion.
B.
Although the issue presented to our Court was whether the district court abused its discretion in denying the City’s motion to extend the 2000 Consent Decree, the majority vacates the district court’s order and remands for the district court to resolve the issue of “whether, 31 years out, the decree’s racial classifications continue to remedy past discrimination ...” I disagree that the district court needs to re-litigate the constitutionality of the consent decree in this case for two principal reasons. First, not a single party has challenged the constitutionality of the 2000 Consent Decree. The majority concedes that the district court “did not style its decision as constitutional,” yet the majority proceeds to raise hypothetical constitutional concerns because the district court’s analysis purportedly “went to a question constitutional in origin: whether the court could lawfully extend the decree’s race-based measures to apply more than 37 years after they were first adopted.” The majority essentially substantiates the district court’s erroneous analysis by reformulating an issue before us on appeal (whether the district court abused its discretion in denying an extension) into an issue that is not before us (whether the 2000 Consent Decree’s provision meets strict scrutiny). Generally, a reviewing court should not consider issues in the first instance when they were not litigated in the trial court except in exceptional circumstances. Taft Broadcasting Co. v. United States, 929 F.2d 240, 243-14 (6th Cir.1991). Although it is the affirmative duty and province of the courts to apply the long-settled limitations of the Constitution, it is neither our duty nor province to create and imagine hypothetical and conceivable constitutional issues that are not properly presented before the court.
The legal basis for extending the 2000 Consent Decree for a reasonable time primarily lies within the terms of the consent decree itself. To the extent that the majority is suggesting constitutional infirmities with an extension for a reasonable amount of time, it is suggesting constitutional infirmities with the 2000 Consent Decree itself. The problem is that no party raised any constitutional objection to the 2000 Consent Decree before the district court. To be sure, the 2000 Consent Decree is a manifestation of a constitutional challenge to the preceding consent decree, so the constitutionality was very much on the minds of the parties and the district court when it approved the 2000 Consent Decree. The decree explicitly states that the parties wished to resolve the litigation “consistent with the Supreme Court’s directives in a series of cases including but not limited to City of Richmond v. J.A. Croson, ... Adarand Constructors, Inc. v. Pena, ... as well as the Sixth Circuit’s guidance in Aiken v. City of Memphis.” (citations omitted). It was upon this understanding of constitutional *754 guidance that the parties fashioned the remedy outlined in the consent decree and upon which the district court placed the imprimatur of the court. The district court was correct to consider the constitutionality of the remedy set forth in the consent decree in 2000 because, as the majority points out, consent decrees are subject to strict scrutiny as with any racial classification imposed by the government. However, the district court considered the constitutionality and concluded that the consent decree met the strict scrutiny requirements as expounded in the relevant Supreme Court and Sixth Circuit cases. That finding was certainly not challenged in 2000 when all parties signed the consent decree; nor was it challenged in 2009 when all parties agreed to extend the consent decree.
Second, the relevant case law has not changed such that a reevaluation of the consent decree’s constitutional compliance is necessary. On appeal, CFFHP argues that the Supreme Court’s decision in Ricci v. DeStefano, 557 U.S. 557, 129 S.Ct. 2658, 174 L.Ed.2d 490 (2009) essentially required the district court to terminate the consent decree. The district court also relied on the holding in Ricci to support its termination of the consent decree. The appellees’ and district court’s reliance on Ricci is misplaced. In Ricci, the Supreme Court considered the question of whether the City of New Haven violated Title VII of the Civil Rights Act of 1964 when its Civil Service Board decided not to certify a newly implemented promotion examination for firefighters after the results indicated the test had a disproportionate adverse effect on minorities. The Court concluded that in order for the City’s actions to be justified under Title VII, it would have to point to a strong basis in evidence that the City would be liable under Title VII if it had not taken action. Because the Supreme Court found that the Civil Service Board could not make such a showing given the evidence surrounding the examination’s validity, the Court held that the Civil Service Board’s decision itself violated Title VII. The Court expressly declined to reach the question of whether the City’s action violated the Equal Protection Clause. Ricci, 129 S.Ct. at 2664-65. An employer-initiated, voluntary race-conscious remedy crafted to preempt a Title VII disparate impact suit — like the one at issue in Ricci — is markedly different than a consent decree founded upon the assent of all parties to remedy a judicial finding that a City’s hiring practices violated the Equal Protection Clause, like the decree at issue here. In short, the decision in Ricci does not extend as far as to warrant a constitutional reassessment in this case— especially when doing so would subvert the clear intent of all parties to “avoid further contentious and expensive litigation” by requiring them to re-litigate the narrowly-tailored and/or compelling interest prongs of strict scrutiny. Even if Ricci clarified the law in some way meaningful to the consent decree here, a clarification in the law does not automatically open the door for relitigation of the merits of every affected consent decree because to hold such would “undermine the finality of such agreements and could serve as a disincentive to negotiation of settlements in institutional reform litigation.” Rufo v. Inmates of Suffolk County Jail, 502 U.S. 367, 389, 112 S.Ct. 748, 116 L.Ed.2d 867 (1992).
Sadly, it is clear that the most salient aspect of this case to the majority and the district court is the longevity of the remedy, not whether justice has been fulfilled. The majority seems to favor expedience over effectiveness. According to the majority, “[t]he question[] whether the decree’s goals have been met” is ultimately subordinate to “the core issue” of whether 31 years may render the 2000 Consent Decree less remedial. The ultimate lesson from our nation’s struggle for racial equali *755 ty is that justice is not always swift and convenient, but it is enduring. When pernicious forms of discrimination have infected the foundation of an institution, the remedy necessarily will take time to fulfill. The passage of time without more does not signify the ineffectiveness of a remedy. Rather, it is the inability of the remedy to produce just outcomes over time that signifies its ineffectiveness.
It is unclear how, short of achieving the goals set forth in a consent decree, the passage of 31 years makes the racial classification less remedial. It is equally bewildering how remedying past discrimination within an institution becomes less compelling because another year has passed. The majority does not answer how remedying past discrimination in the Cleveland Fire Department can be compelling in 1977, yet while the effects of past discrimination still linger — as they clearly do here given that the Cleveland Fire Department has not reached the agreed-upon goal of a 33 1/3% minority demographic— it may not be compelling in 2009. What is significant about 13 years (or 31 years) such that the majority is willing to make it the benchmark, a priori, for when the “remedial purpose of affirmative action [is] satisfied?” (internal citations and quotation marks omitted). The arbitrariness attendant with this time-oriented approach to narrow-tailoring, rather than a results-oriented approach, would undermine any good-faith attempt to fashion a serious remedy to longstanding discrimination— especially in the context of institutional reform litigation. Such a narrow approach would provide a safe haven for the most virulent forms of discrimination, whose effects will outlast an arbitrary number of years affixed to a remedy.
Our decision in Rutherford speaks persuasively on the duration of race-conscious relief as it relates to consent decrees. The Cleveland Police Department had a similar past of racial discrimination in hiring, and yet a more aggressive hiring ratio. When the non-minority police officers argued that the remedial measures extended too far in time, we acknowledged that although narrow-tailoring will not allow race-conscious relief to extend in perpetuity, remedial action takes time, precisely because discrimination may linger for many years in an organization. See Rutherford, 179 Fed.Appx. at 380.
In the instant case, although the consent decree had been in operation for 31 years when it was terminated, it was only functional for 24 years because the City stopped hiring qualified candidates in 2001 due to its budgetary constraints. The City further stopped creating eligible lists to allow for more qualified minority candidates to be considered. The remedy set forth in the 2000 Consent Decree was neither arbitrary nor perpetual. The Headers ratio prescribed a hiring ratio commensurate with the percentage of minority candidates who passed the entrance examination. The decree had a concrete expiration date of September 29, 2008, and a provision which would allow it to be extended for only a reasonable amount of time. In 2009, the parties agreed to extend the decree a final time and implemented a firm sunset date of December 31, 2014. During the years that the consent decree was functional, the percentage of minority firefighters increased from 4% to 26%. During the years the consent decree was not functional, the percentage remained stagnant, failing to reach the goal of 33 1/3%. As such, I cannot agree with the majority’s reasoning that the consent decree’s 31 years of operation may render its goal of remedying past discrimination less compelling or its method less effective.
III.
I conclude by refocusing on the actual issue presented in this appeal, which is *756 whether the district court abused its discretion in denying the City of Cleveland’s motion for an extension. I emphasize that the district court did abuse its discretion. The arbitrary and cavalier nature of the district court’s decision was further illustrated at oral argument where the appellants claimed that Judge Nugent, off the record, told the parties, “You either come back with [a proposal of a two-year extension] or I’m going to rule.” The appellants claim that the district court did not indicate why his proposal of a two-year extension was suggested or even how it was reasonable. The judge left the parties in a position where they were force to choose between his way or the highway, and Judge Nugent’s way prevailed. Throughout the history of this litigation, three federal district court judges decided that a consent decree was necessary to remedy the effects of a history of employing a discriminatory entrance examination. Judge William Thomas first found Cleveland Police Department’s use of the entrance examination was unconstitutional and signed a consent decree into effect in the Shield Club litigation, see Rutherford, 179 Fed.Appx. at 368-72; Judge Robert Krupansky then found the Cleveland Fire Department’s use of the same entrance examination to be unconstitutional; and Judge John Manos found it necessary to sign the instant consent decree into effect in 1977, 1984, and 2000.
Judge Nugent’s decision to terminate the consent decree was at odds with: (i) Judge Krupansky’s finding that the Cleveland Fire Department engaged in discriminatory hiring practices; (ii) Judge Manos’s finding in 2000 that a consent decree was still necessary to remedy past discrimination; (iii) the consent decree’s express goals of either a 33 1/3% minority population or the establishment and hiring from two additional eligible lists, when the actual minority population was 26% and the City did not establish any additional eligible lists; (iv) the text of the decree stating that an extension shall be granted upon a finding of legitimate circumstances for noncompliance and a good faith effort; (v) the legitimate request for an extension of time by the City of Cleveland, which represents the interest of all its residents and employees; (vi) the legitimate motion for an extension of time by the Vanguards, who represent the interest of minority firefighters and applicants; and (vii) CFFHP’s consent to extend the decree until December 14, 2014 at the latest. There was but one factor standing on the other side of justice: Judge Donald Nu-gent. I vigorously dissent.

. In Shield Club v. City of Cleveland, 370 F.Supp. 251 (N.D.Ohio 1972), Judge William Thomas found that the entrance examination for patrolman conducted by the Cleveland Civil Service Commission had a racially discriminatory impact on Blacks and Hispanics and the City of Cleveland could not demonstrate that the exam was job-related. 370 F.Supp. at 254.

. On October 23, 1980, the Vanguards filed a class action on behalf of Black and Hispanic firefighters already employed by the City, primarily alleging that the City unlawfully discriminated on the basis of race and national origin in awarding promotions within the fire department in violation of the Thirteenth and Fourteenth Amendments to the United States Constitution, Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., and 42 U.S.C. §§ 1981, 1983. Local 93 of the International Association of Firefighters ("Local 93”), a local union representing a majority of Cleveland's firefighters, was allowed to intervene pursuant to Fed.R.Civ.P. 24(a)(2). The City, having unsuccessfully contested the basic factual issues in other lawsuits, entered into a consent decree with the Vanguards over the objection of Local 93. The consent decree aimed to remedy the disproportionate rate of promotions between Blacks and Hispanics and their White colleagues. Local 93 challenged the consent decree claiming that the consent decree was an unreasonable penalty on innocent non-minority firefighters. See Vanguards of Cleveland, v. City of Cleveland, 753 F.2d 479, 484 (6th Cir.1985). This Court rejected Local 93's argument and upheld the consent decree. Id. The Supreme Court also upheld the consent decree in Local Number 93, International Ass'n of Firefighters v. City of Cleveland, 478 U.S. 501, 106 S.Ct. 3063, 92 L.Ed.2d 405 (1986).

. Although the City of Cleveland is formally an appellee, it effectively raises an appellant’s argument that the district court erred in denying its motion for an extension of time to comply with the 2000 Consent Decree.